Filed 4/16/13  In re Jay H. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re JAY H., A Person Coming Under the Juvenile Court Law. | B243860 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>LANETTE W.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK77453) |

APPEAL from an order of the Superior Court of Los Angeles County, Phillip Soto, Judge.  Affirmed.

Roland Koncan, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent.

Mother, Lanette W., appeals from the denial of a petition for change of order after reunification services were terminated with her son, Jay H. Mother sought the child's placement in her home or the continuation of reunification services. We conclude that the trial court did not abuse its discretion in denying the motion, as mother failed to establish changed circumstances and that the changes she sought were in the best interests of the child. We therefore affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

Jay was born in April 2010. He was diagnosed with Down syndrome, which caused various physical ailments and developmental delays. Mother has a history of mental and emotional problems; she was diagnosed with schizophrenic disorder-paranoid. Jay's older brother, D., had already been declared dependent, and had been placed in mother's home.

On May 18, 2010, a "Team Decision Making" meeting was held. At the meeting, Jay appeared dehydrated and lethargic. It was recommended that mother take Jay to see a physician. Mother immediately took Jay to the hospital, where he was admitted for tests. On May 20, mother agreed to sign a voluntary reunification agreement, whereby Jay would be placed in a special needs foster home with the purpose of mother being able to train with a foster parent who could help her with Jay's needs. Jay was discharged from the hospital on May 21, with a diagnosis of failure to thrive secondary to severe gastroesophageal reflux disease, and a small cardiac defect.

After Jay's placement in foster care, mother's behavior became "erratic and misguided." Mother did not appear to be able to process the serious medical concerns

2

related to Jay. Mother twice left D. with a babysitter so that she could seek mental health assistance at the hospital. On June 28, mother decided to admit herself to the hospital, due to feeling overwhelmed and breaking down.[1]

On July 2, 2010, while mother was still hospitalized, Jay was detained,[2] and both children were placed in foster care. The boys were designated a sibling group, but they were placed in different foster homes due to Jay's special needs. Mother was granted monitored visitation three times per week for two hours. Mother left the hospital on July 6, 2010. She was compliant in her treatment and behaved appropriately.

Eventually, D. would be returned to mother's custody, and jurisdiction terminated over him. Moreover, it was undisputed that mother was fully compliant with her mental health counseling and medication. She completed parenting and domestic violence classes, as directed. The sole issue in this case, and the reason for which reunification services were ultimately terminated, was mother's inability to comprehend and cope with Jay's special needs. We therefore focus the remainder of our discussion on mother's visitation with Jay.

Mother visited Jay once per week, for one hour. The foster mother reported that mother appeared uncomfortable when given the task of feeding Jay. Mother accomplished the task, but needed constant monitoring and supervision. She did not

[1]     Mother also heard voices when she was bathing D. According to mother's former psychiatrist, the voices were not dangerous to the child. "[T]hey are fear based that she might make a mistake and hurt the child."

[2]     Jay was detained under Welfare & Institutions Code section 300, subdivision (b), due to mother's inability to care for the child due to her mental and emotional difficulties.

3

appear to understand the extent of Jay's medical condition, and was obviously uncomfortable.

At a pretrial resolution conference on August 12, 2010, mother represented that she was not receiving the three visits per week to which she was entitled. The court ordered the Department of Child and Family Services (DCFS) to speak with mother and foster mother "in order to [integrate] the mother into the parenting of the minor." The court reaffirmed that mother may visit three times per week for two hours each visit.

Jay suffered from laryngomalacia (soft larynx), which caused respiratory difficulties. It was therefore necessary to hold him at a 45 degree angle, in order to enable him to breathe. Mother took advantage of her full visitation opportunities; but, during the visits, she failed to properly support Jay's head, even with repeated direction from the visitation monitors. On September 8, 2010, Jay's doctor recommended that mother's visits be discontinued until Jay's respiratory issues stabilized and mother was "trained thoroughly" on this type of care.[3] On September 15, 2010, Jay was declared dependent.

Mother's visits became less regular. She failed to appear at a scheduled visit on September 20. At a visit on September 29, mother was corrected twice on how to hold Jay at the proper angle. At a visit on October 25, 2010, the social worker again showed mother how to hold Jay at an angle; mother took Jay and immediately held him flat.

---

[3]     Mother and Jay had been meeting regularly with a child development specialist. There is no dispute that mother wanted to learn how to care for Jay; she simply was unable to do so.

4

The disposition hearing was held on December 2, 2010. Jay was placed in foster care; DCFS was to provide reunification services to mother. Mother was granted monitored visits twice per week for two hours, with one *unmonitored* two-hour visit per week.

Mother did not take advantage of her complete visitation rights and, as far as the record indicates, never had an unmonitored visit with Jay. While she did attend her monitored visits, she cancelled a few of the visits, and frequently terminated her visits after only one hour. During monitored visits, mother again had to be reminded how to properly hold Jay. Mother also failed to comprehend Jay's developmental delays, believing that Jay could hold up his head and crawl, when he could not.[4]

A progress hearing was held on March 3, 2011. There was no change in the orders. During the next two months, at mother's request, she had one three-hour visit with Jay per week, monitored at the DCFS office. Although she attended regularly, she frequently stayed for less than one hour. Mother would feed and change Jay, then rock him to sleep. Once Jay was asleep, mother would end the visit. During these visits, mother was regularly reminded to hold Jay at the proper angle.

Mother continued to have unrealistic expectations of Jay's abilities, believing that he could sit up on his own and walk. Mother was "struggling with the fact Jay is disabled and what this means as to his growth and development."

---

[4]     When Jay was nine months old, he functioned at the developmental age of a four- to five-month-old.

5

Mother also attended monthly visits with Jay at a center for child and parental wellness called Parentwood. Siggie Cohen at Parentwood[5] reported that mother properly stimulated Jay with her vocal intonations and fluctuations. However, in her May 17, 2011 letter, Cohen indicated "Concern or a goal: how to help [mother] get comfortable caring for Jay on a more practical and basic level."

Visits continued sporadically through June 2011. Mother canceled several monitored visits, and remained for only one hour when she did attend.

A review hearing was held on July 14, 2011. At the hearing, Jay's counsel requested "unmonitored visits for perhaps a short amount of time" for Jay. Mother's counsel agreed, seeking "short unmonitored visits" for Jay before the case reached the 12-month permanency hearing (Welf. & Inst. Code, § 366.21, subd. (f)). DCFS and the trial court both agreed that mother had been entitled to unmonitored visitation under the court's prior orders. The court indicated that the prior orders, allowing one unmonitored visit per week, remained in effect. The court added, "She should take advantage of that."

Over the next six months, it does not appear that mother took advantage of her unmonitored visitation opportunities. Moreover, DCFS arranged for mother to attend some of Jay's developmental and/or occupational therapy sessions, in order to better learn how to care for Jay. Mother took the position that her attendance at the therapy sessions "would take the place of her current court ordered visitation." Mother

---

[5] Cohen would ultimately be mother's strongest advocate for the continuation of reunification services.

6

cancelled several of the sessions, and, when she did attend, did not stay for the entire 50-minute session. When mother attended, she was an active participant in therapy. Mother took the therapist's suggestions well; however, she had difficulty following through when Jay did not respond. She was easily frustrated during sessions, and the therapist continued to educate her on appropriate problem solving tools for situations in which Jay did not respond as expected.

From September 15, 2011, a visitation log kept by the foster mother[6] showed many missed and shortened therapy session visits.[7] By this time, D. had been placed in mother's home, and mother sometimes cancelled visits with Jay due to D.'s needs – three times because D. was home from school and it would be "too difficult" to bring him, and once because it was D.'s birthday.[8]

---

[6] Jay's foster care placement was changed on September 8, 2011. The new foster mother kept a visitation log.

[7] Jay continued to make slow, steady progress developmentally. By late October, 2011, when Jay was 18 months old, his developmental skills were at the nine- to ten-month level. His language and social skills were slightly more delayed.

[8] The January 13, 2012 visit failed to occur due to a miscommunication. When mother cancelled the January 6, 2012 visit, the therapist indicated that she would see mother the following week. Mother disagreed, stating that she believed she would regain custody of Jay at the January 12, 2012 court hearing. As mother had expressed no interest in the January 13 session, the therapist changed the time of the session to better accommodate the foster mother. As mother did not regain custody on January 12, she attended the therapy session at the regular time. As she had failed to tell anyone she intended to attend, nobody was there when mother arrived. When mother and the therapist discussed the failure to communicate, mother accused the therapist of lying about her in court reports, so that she would not get her son back. At that point, the therapist involved chose to no longer monitor mother's therapy visits, reporting that mother was "very unstable." As Jay received therapy from several different therapists,

7

Mother's reunification services were terminated on March 6, 2012. The matter was sent for a hearing on termination of parental rights under Welfare & Institutions Code section 366.26, on July 12, 2012. Visitation, however, continued.

Over the next few months, mother visited with Jay weekly at the DCFS office and continued to participate in Jay's therapy weekly. Both the DCFS monitors and Jay's therapist reported that Jay was apprehensive when mother attempted to have contact with him, and sought reassurance from others.[9] The therapist also reported that mother's attendance at therapy visits was irregular; mother missed sessions and attended others for less than the full 50 minutes. Mother still failed to grasp the purpose of therapy, attempting to manually assist Jay in performing tasks which are necessary for him to learn to independently perform safely. When this was explained to mother, she properly withdrew assistance and verbally encouraged him.

The July 12, 2012 hearing was continued to September 4, 2012. On August 24, 2012, mother filed a petition for change of order, under Welfare & Institutions Code section 388. Mother sought return of Jay to her home or additional reunification services. Her reason for the petition was: "Jay & I have [a] wonderful relationship & the child is always best with their mother."

---

and mother only attended one session per week, mother was rescheduled to participate in Jay's therapy with a different therapist.

[9]     Cohen monitored a visit between mother and Jay at her office on May 8, 2012. According to the person who transported Jay to the visit, Jay started crying as soon as he saw mother. Mother held him and Jay seemed to be OK, but continued to cry. Cohen stated that the interaction between mother and Jay "was comfortable," although she conceded that Jay cried inside her office.

Mother supported her petition with a letter from Cohen, who had monitored four weekly visits between mother and Jay, in her office, from July 25 through August 15. Cohen admitted that in the first visit, "at first Jay was hesitant and even resistant towards mom and the environment, but by the end of the visit he was nestled in her arms willingly." At the second visit, mother brought D., who interacted well with Jay. By the third visit, Jay was completely comfortable with mother and the environment. Cohen believed the visits "were going well, heading and achieving more comfort, and recognition." She wanted mother to be "given more opportunities to care for Jay's typical and daily needs, more involved in all his therapies, and more recognized as a valid figure in his life by all."

Mother also relied on a letter from a social worker from her mental health treatment center. The social worker observed the July 26, 2012 physical therapy session which mother attended.[10] She indicated that there were times during the session when mother needed to be redirected because she wanted to engage more with her son than was expected. She stated that although the therapist spoke to mother, the therapist appeared to have some difficulty taking time out of the session to explain things to mother. She concluded that mother was attentive and eager to learn how to interact with Jay. This was the first time mother attended one of Jay's therapy sessions for the full 50 minutes.

---

[10] Mother believed the therapists were providing a biased view to the court, so wanted her social worker there to provide a more objective viewpoint.

The trial court set a hearing on mother's motion. DCFS opposed mother's motion on the grounds that mother still failed to understand the scope of Jay's disability,[11] and had not learned how to care for Jay. At DCFS-monitored visits, Jay continued to show stranger anxiety toward mother, and cried uncontrollably when mother held him.

At the hearing on the motion, mother initially failed to attend.[12] All parties relied on documents only; no witness testimony was offered. Mother appeared during argument; she did not then request to testify. Mother's counsel argued that mother "consistently visits as best she can," but conceded that mother often left visits early and arrived late due to her responsibilities to care for D. Mother took the position that her witnesses' letters refuted DCFS's position regarding the quality of visits, and argued that further reunification services were justified.

The trial court concluded that mother failed to establish a change of circumstances and failed to demonstrate that returning Jay to her custody or granting further reunification services would be in Jay's best interests. Mother's petition for change of order was therefore denied. Mother filed a timely notice of appeal.

---

[11]    In April 2012, at two years of age, Jay's gross motor skills were that of a 17 or 18-month-old. His cognitive skills were in a similar range. He was mildly delayed in language skills; he had a larger vocabulary in sign language than verbally. Jay's behaviors were changing; he was often defiant and preferred playing in front of a mirror.

[12]    The hearing was set for 8:30; the court began proceedings at 8:45, and mother was not yet present.

## *ISSUE ON APPEAL*

The sole issue on appeal is whether the trial court abused its discretion in denying mother's petition for change of order.

## *DISCUSSION*

Mother contends the dependency court abused its discretion in denying her petition for modification under Welfare & Institutions Code section 388. Section 388 provides, in pertinent part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made."

The dependency court's decision whether to modify the previous order is within its discretion, and will not be disturbed on appeal unless an abuse of discretion is clearly established. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704.) The petitioner has the burden of proving by a preponderance of the evidence that the proposed change is in the best interests of the child. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1083.) The petitioner must prove both changed circumstances and that the modification is in the best interests of the child. (*Id.* at p. 1086.)

The "best interests" analysis requires more than a simple comparison of the household and upbringing offered by the natural parents and the caretakers. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) Other factors to consider include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be

11

easily removed or ameliorated, and the degree to which it actually has been." (*Id.* at p. 532.)

"[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

The trial court concluded mother failed to establish a changed circumstance, and we agree. Mother's visitation with Jay after reunification services had been terminated was no different than her visitation prior to the termination of reunification. Throughout the more than two years of dependency proceedings, mother failed to take advantage of the numerous visitation opportunities offered to her. Having been offered visitation three times per week, including unmonitored visitation, mother elected to visit only once (and sometimes twice) per week, and never unmonitored. Mother missed many visits, was frequently late for visits, and often left early. Although mother's commitment to learning how to care for Jay's special needs cannot be disputed, her

12

inability to do so was supported by substantial evidence. Just as, in early visits, it was necessary to repeatedly reinstruct mother to hold Jay at the proper angle, in later visits, it was necessary to repeatedly reinstruct mother on how to properly interact with Jay during his therapy sessions. Mother simply failed to grasp the scope of Jay's disabilities, and the special needs arising therefrom.

Moreover, substantial evidence supports the conclusion that the best interests of Jay would not be served by a continuation of reunification services. The child had been in foster care for nearly all of his life, and was well-bonded to his foster parents. In contrast, Jay often cried at visits with his mother and continued to show stranger anxiety in her presence. Even mother's witness, Cohen, conceded that, as late as July 25, 2012, Jay was "hesitant and even resistant towards" mother. Although Cohen believed that Jay became more comfortable with mother over the next few weeks, this minimal progress was not sufficient to justify further reunification services at such a late date. Jay's interest in permanency and stability was simply more important than creating a parent-child bond which did not then exist.

Two additional arguments of mother must be addressed. First, mother relies on two letters from her psychiatrist. The first letter stated that mother "should be reunited with her child at the earliest opportunity following your investigation." The second letter stated that the psychiatrist had observed mother interacting "with her second child literally dozens of times, . . . both while symptomatic and symptom free." The psychiatrist concluded that "while she does in fact suffer from a severe and lifelong psychiatric affliction, this condition did not impair her parenting skills and

13

responsibilities." The psychiatrist was "confident based on this experience that she can competently discharge her parenting responsibilities toward her second child." The letters are irrelevant, in that they pertain to mother's ability to parent D., not her ability to parent *Jay*.[13]

Second, mother argues that, based on Cohen's observation of a single positive visit between Jay and D., Jay's best interests would be served by maintaining and developing his *sibling* relationship. Preliminarily, the maintenance of a sibling relationship is something to be considered at the Welfare & Institutions Code section 366.26 hearing, as it may provide a compelling reason not to terminate parental rights, regardless of whether reunification services have been terminated. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v).) Thus, the existence of a sibling relationship would not provide a justification for continuing reunification services for a parent. In any event, mother has totally failed to establish the existence of a sibling relationship. While the record indicates one positive visit between the boys in August 2012, the record also demonstrates that mother made no efforts to preserve a sibling relationship prior to that time. Indeed, rather than bring D. to Jay's therapy visits, mother often chose to cancel the visits and spend time with D. alone.

---

[13] D. was, in fact, mother's second child. The record indicates that mother's first child, Pierre, lived with her until the age of eight, when the maternal uncle took custody. Moreover, the psychiatrist who wrote these letters treated mother "during the year prior to March 2009," when he made the observations on which he relied. As Jay was not born until April 2010, it is clear that this psychiatrist could not possibly have observed mother with Jay. As such, the psychiatrist's opinions as to mother's ability to parent D. have no bearing on her ability to parent her younger, special needs child.

14

We emphasize that mother's attempts to control her mental illness have been exemplary. Mother regularly attended counseling, was always compliant with her medication requirements, and promptly sought help when circumstances became too overwhelming for her. We also recognize mother's genuine affection for Jay, and the undisputed fact that mother regularly expressed an interest in learning to care for Jay. However, we also recognize that Jay is a special needs child, suffering from several physical ailments secondary to Down syndrome, as well as developmental delays. Despite mother's best intentions, she has shown herself to be unable to learn to cope with, and respond to, Jay's needs. Moreover, Jay is well-bonded to his foster mother, who is well-equipped to care for Jay's special needs. While the evidence is disputed as to whether Jay is still frightened of his mother, there is no evidence that he has bonded to her, and turns to her for comfort and basic care. The trial court did not abuse its discretion in denying mother's motion.

## *DISPOSITION*

The order is affirmed.

## *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, Acting P. J.

WE CONCUR:

KITCHING, J.

ALDRICH, J.

16